PLAYBOY ENTERPRISES,
INC., Plaintiff,

v.

WEBBWORLD, INC., d/b/a Netpics.Com,
Bentley Ives, James Gurkin, and Benjamin Brian Ellis, Defendants.

No. Civ. 3–96–CV–3222–H.

United States District Court,
N.D. Texas,
Dallas Division.

Dec. 11, 1997.

David L. Hitchcock, Sidley & Austin, Dallas, TX, John D. Vandenberg & Scott D. Eads, Klarquist Sparkman Campbell Leigh & Whinston, Portland, OR, for Plaintiff.

Lawrence Brown and Denis L. Toothe, Fort Worth, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

SANDERS, Senior District Judge.

On November 19, 1997, the Court conducted a non-jury trial of this case. After consideration of the admissible evidence presented therein, along with the arguments of counsel, the Court renders this decision.

Plaintiff Playboy Enterprises, Inc., has prevailed in its claim for direct and indirect copyright infringement against Defendants Webbworld, Inc., Bentley Ives, and Benjamin Brian Ellis, who owned or operated an Internet website that offered sexually-oriented photographs and images to subscribers for a monthly fee. The Court finds that those Defendants impermissibly reproduced, distributed, and displayed images substantially identical to ones appearing in Plaintiff's copyrighted publications. With regard to five of the copyrights, the infringement was willful. In addition to statutory damages of $310,000 awarded at summary judgment, the Court awards $129,000 in statutory damages, plus attorney's fees. A permanent injunction will issue. On all remaining claims, the Court finds for Defendants.

## I. PROCEDURAL HISTORY

On December 2, 1996, Plaintiff Playboy Enterprises, Inc. ("PEI"), filed this action for copyright infringement, trademark infringement, and unfair competition. After a hearing on December 9, 1996, the Court granted a temporary restraining order, and on January 6, 1997, the Court entered an agreed preliminary injunction. Both orders forbad Defendants, owners and operators of an adult-oriented Internet website, from directly or indirectly infringing PEI's copyright and trademark registrations.

On June 27, 1997, Judge Dale E. Saffels, a visiting judge to whom the case was referred, granted summary judgment against Defendant Webbworld, Inc., for direct copyright infringement of sixty-two PEI images. *See Playboy Enterprises, Inc. v. Webbworld, Inc.,* 968 F.Supp. 1171 (N.D.Tex.1997) (*"Webbworld"*). Moreover, Judge Saffels found two of the individual Defendants, Bentley Ives and Benjamin Brian Ellis, jointly and severally liable for vicarious infringement. Judge Saffels awarded $5,000 per infringement, for a total award of $310,000 to Plaintiffs on the copyright claims, plus reasonable attorney's fees. Finding material issues of fact, Judge Saffels declined to award summary judgment with regard to sixteen of the seventy-eight images at issue. Judge Saffels similarly reserved decision on the willfulness of the infringement. Finally, Judge Saffels summarily denied PEI's motion against Netpics for contempt of court. Following his decision, Judge Saffels referred the case back to this Court for trial.

In the present opinion, the Court disturbs neither the conclusion nor the reasoning of Judge Saffels's summary judgment. The issues remaining for decision after non-jury trial are PEI's claims for the following: (1) copyright infringement of twenty-nine PEI registrations—the sixteen on which Judge Saffels reserved opinion, plus thirteen not included in PEI's motion for summary judgment; (2) vicarious liability of Defendants Ellis and Ives for the remaining twenty-nine alleged infringements, and of Defendant Gurkin for all of the alleged infringements; (3) willfulness; (4) trademark infringement and unfair competition under the Lanham Act; (5) Texas common-law unfair competition; (6) dilution of PEI's trademarks; and (7) contempt against Ellis for alleged violation of the preliminary injunction. PEI requests

statutory, actual, and punitive damages, a permanent injunction, and attorney's fees.

## II. FACTUAL BACKGROUND

Since approximately 1953, Playboy Enterprises, Inc. ("PEI"), has published the monthly *Playboy* magazine and other publications. It is undisputed here that PEI owns valid trademark or service mark registrations for the famous "Rabbit Head" design, for the name "Playboy," for the name "Playboy's Playmate Review," and for the name "Playmate." It is also undisputed that PEI holds valid copyrights for the images in its magazine issues and other publications.

Defendant Webbworld, Inc. ("Webbworld"), is a Texas corporation that operated "Netpics," an adult-oriented site on the Internet's World Wide Web, from about May 1996 until February 1997. Webbworld ceased operating at that time upon seizure of their equipment in a raid by the Fort Worth police on charges of child pornography. Pretrial Order, Stips. ¶ 5. The gravamen of PEI's Complaint here is that the Defendants infringed certain copyrighted nude and semi-nude female images ("the images"), some of which bore PEI trademarks. Webbworld made those images available on the Netpics site to Internet users for a monthly subscription fee.

Webbworld had three principals, individual Defendants Bentley Ives ("Ives"), James Gurkin ("Gurkin"), and Benjamin Brian Ellis ("Ellis"). Ellis had the original idea for the Netpics site and wrote the software that allowed it to function. Gurkin and Ives contributed the start-up capital. Ives was, until the final month of the company's existence, sole shareholder and president of Webbworld. Gurkin worked as Webbworld's customer service representative. The net profits of the business were distributed 50% to Ellis, and 25% each to Gurkin and Ives.

The equipment for Webbworld's Netpics website consisted of fifteen personal computers, a modem, and three telephone lines, all of which were located in an office building in Dallas, Texas. One of the computers functioned as a news server; one handled accounting and administrative data; and the remaining twelve were used as web servers.

The web servers were where the Netpics site "existed" on the World Wide Web. They were used to store, reproduce, display, and distribute adult images to Webbworld subscribers.

Webbworld obtained the images that it sold from selected adult-oriented Internet "newsgroups." A newsgroup is an Internet forum for the exchange of ideas by people of similar interests. Newsgroups exist on the Usenet, which like the World Wide Web is an aspect of the Internet. A newsgroup typically specializes in a certain subject area, such as sports, for example, or Cajun cooking. A substantial number of newsgroups are devoted to sexually explicit material. Newsgroups feature discrete collections of information called "articles." Newsgroup participants may "post" (upload) articles, which consist of text and/or images. Images may be posted by using hardware called a scanner to convert, for example, a photograph to a digital file, which may then be uploaded onto the newsgroup in the same way that text is transferred. Once online and within a newsgroup, a participant may post an article, may view one of many articles on the computer screen, and may download an article to his or her computer for later retrieval or printing. None of the Defendants here themselves posted any of the PEI images at issue to any of the newsgroups.

Webbworld obtained its images from selected newsgroups according to the following general method. Defendant Ellis selected the particular adult-oriented newsgroups to be downloaded. Periodically, Webbworld received a "news feed," which consisted of digital files from the selected adult newsgroups. The information was downloaded onto the news server computer. The feed consisted of both text and images, representing all of the new material that had been posted onto the newsgroup since the last feed.

The heart of the Webbworld operation was "ScanNews," software that Ellis had developed. ScanNews took the news feed, discarded most of the text, and retained the sexually-oriented images. A small amount of identifying text was sometimes retained. After the news feed was edited, the news ser-

ver would announce to the twelve web servers, via the ScanNews software, that its images were ready to be transferred. Each of the web servers would contact the news server computer and copy into memory the new adult images stored there. The news server then discarded that data to make room for the next news feed.

Besides discarding text, the ScanNews software altered the news feed in a second way. It created two "thumbnail" copies, one large and one small, for each of the adult images downloaded from the Usenet. The thumbnail images enabled Webbworld to display many images on a single screen. Moreover, the thumbnails could be downloaded more quickly than full-sized images. The thumbnails were not part of the news feed; they were created by the ScanNews software to facilitate Webbworld's sale of the images they represented.

After being loaded onto the web servers, the thumbnail and full-sized adult images were available to any Internet user willing to pay Webbworld a subscription fee of $11.95 per month. The subscription process could be completed online in about 30 seconds with a major credit card. Before gaining access to the Webbworld Netpics site on the World Wide Web, a potential user would first have had to gain access to the Internet via his or her Internet service provider ("ISP"), sometimes called an access provider ("IAP"). Then, the person would employ browser software to access various sites on the World Wide Web. Webbworld's Internet address was "http://www.netpics.com." That address would be typed into a user's browser software for immediate access to Webbworld's site.

Upon entering Netpics, a subscriber was given the choice whether to view images in large or small thumbnail format. After making that choice, the user could view a full-sized image by clicking on the corresponding thumbnail. Webbworld provided instructions to its subscribers about viewing images and about downloading them into the memories of their own computers for later retrieval.

Every day, Webbworld obtained between 5,000 and 10,000 new images. An approximately equal number were deleted to make room for the new arrivals. On average, an image was stored on Webbworld's computers and thus made available to subscribers for about six days before being deleted. Webbworld normally stored and displayed about 40,000 to 70,000 images at any given time.

During the time Webbworld was in operation, many hundreds of copyrighted PEI images appeared on the website. Some of those images appeared in close association with one or more of PEI's trademarks. PEI never authorized Webbworld to reproduce, display, or distribute any of those images or marks.

## III. DIRECT COPYRIGHT INFRINGEMENT

Based on the facts related above, PEI alleges that Defendant Webbworld is directly liable for copyright infringement. For the reasons that follow, the Court agrees.

■ To prevail on a claim for direct copyright infringement, PEI must prove (1) ownership of the asserted copyrights, and (2) "copying" by Webbworld. *See Lakedreams v. Taylor,* 932 F.2d 1103 (5th Cir.1991); *Central Point Software, Inc. v. Nugent,* 903 F.Supp. 1057, 1059 (E.D.Tex.1995). Direct infringement does not require intent or any particular state of mind. *Religious Tech. Center v. Netcom On–Line Comm. Servs.,* 907 F.Supp. 1361, 1367 (N.D.Cal.1995); *see Playboy Enterprises, Inc. v. Frena,* 839 F.Supp. 1552, 1559 (M.D.Fla.1993) ("Intent or knowledge is not an element of infringement, and thus even an innocent infringer is liable...."); *Key Maps, Inc. v. Pruitt,* 470 F.Supp. 33, 38 (S.D.Tex.1978) (explaining that intent to infringe need not be proved).

In this case, PEI has submitted to the Court twenty-nine copyright certificates of registration. *See* Plf's Trial Exhibit ("Exh.") 5. The parties have stipulated that the registrations are valid and enforceable. Supp. Stip. & Exh. A (filed November 18, 1997). Accordingly, the sole element of infringement remaining for PEI to prove is whether Webbworld "copied" the registered images.

■ "Copying" is a judicial shorthand for the infringement of any of a copyright

owner's exclusive rights. *Worlds of Wonder, Inc. v. Veritel Learning Systems, Inc.,* 658 F.Supp. 351, 354 (N.D.Tex.1986); *see* 17 U.S.C. § 106 (setting forth a copyright owner's rights). Because direct proof of copying is rarely available to a copyright owner, copying is normally shown by proving (a) that a defendant had access to the copyrighted work; and (b) substantial similarity between the copyrighted work and the accused work. *Lakedreams,* 932 F.2d at 1107. Alternatively, where proof of access is absent, copying may be proved by showing a "striking similarity" between the copyrighted work and the accused work. *Ferguson v. National Broadcasting Co.,* 584 F.2d 111, 113 (5th Cir.1978) (holding that if two works are so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access).

In this case, Webbworld cannot claim to have lacked access to PEI's famous publications. The uncontroverted testimony at trial is that PEI's periodicals are widely distributed throughout the United States.

Even if proof of access were lacking, however, the Court would still find "copying" to exist. The electronic images downloaded from Webbworld's computers and offered as evidence at trial are not merely "strikingly similar" to PEI's photographs, but are virtually identical. *See* Exh. 5 (consisting of twenty-nine tabs with the relevant copyright registration, a photocopy of the copyrighted images, and copies of identical images downloaded from the Netpics site). Furthermore, a few of Netpics' electronic copies self-proclaim their origin by bearing a PEI title or emblem.

■ Having established that the accused electronic files are copies of PEI's photographs, PEI must establish that Webbworld has violated one or more of the five exclusive rights granted to a copyright holder. *See Playboy Enterprises, Inc. v. Starware Pub. Corp.,* 900 F.Supp. 433, 437–38 (S.D.Fla. 1995); *Frena,* 839 F.Supp. at 1555–56; *Meadowgreen Music Co. v. Voice in the Wilderness Broadcasting, Inc.,* 789 F.Supp. 823, 825 (E.D.Tex.1992). Under The Copyright Act, the bundle of rights enjoyed by a copyright owner includes, among other things, the ex-

clusive right to do, or to authorize, any of the following:

(1) Reproduce the copyrighted work;

(2) Distribute copies of the copyrighted work to the public by sale or other transfer of ownership; and/or

(3) Display the copyrighted work publicly.

17 U.S.C. § 106. Using, or authorizing the use of, a copyrighted work in any one of these three ways, without permission of the copyright owner, constitutes actionable copyright infringement. *Starware Publishing Corp.,* 900 F.Supp. at 438–39; *Frena,* 839 F.Supp. at 1555–56; *Worlds of Wonder,* 658 F.Supp. at 354; 17 U.S.C. § 501(a). In this case, PEI has established by a preponderance of the evidence that Webbworld violated all three of these rights.

First, Webbworld "reproduced" unauthorized copies of copyrighted PEI images. On each of the twelve Webbworld web server computers and for each of the images at issue, Webbworld created two thumbnail copies and also reproduced a full-sized image downloaded from the newsgroup. *See MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 519 (9th Cir.1993), *cert. dism'd,* 510 U.S. 1033, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994) (holding that copying occurs when a computer program is transferred from a permanent storage device to a computer's random access memory).

Second, Webbworld "distributed" PEI's copyrighted works by allowing its users to download and print copies of electronic image files. Those files, stored on the web servers, contained virtually exact reproductions of copyrighted PEI images. Thus, Webbworld violated PEI's exclusive right to distribute its copyrighted works. *See Central Point Software, Inc.,* 903 F.Supp. at 1061 (ordering forfeiture of all computer hardware used to distribute plaintiff's copyrighted software on an electronic bulletin board); *Frena,* 839 F.Supp. at 1556 (finding a similar violation).

■ Finally, Webbworld violated PEI's exclusive right to "display" its copyrighted works. To display a work means "to show a copy of it, either directly or by means of a film, slide, television image, or any other

device or process." 17 U.S.C. § 101. Webbworld allowed its paying subscribers to view PEI's copyrighted works on their computer monitors while online. Such action constitutes a display, as the *Frena* court explains:

> The concept of display is broad. It covers "the projection of an image on a screen or other surface by any method, the transmission of an image by electronic or other means, and the showing of an image on a cathode ray tube, or similar viewing apparatus connected with any sort of information storage and retrieval system." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 64 (Sept. 3, 1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5677. The display right precludes unauthorized transmission of the display from one place to another, for example, by a computer system. *See* H.R.Rep. No. 1476, 94th Cong., 2d Sess. 80 (Sept. 3, 1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5694.

839 F.Supp. at 1556–57.

Defendant Ives testified that no image existed until the Netpics subscriber downloaded it. That assertion is disingenuous. The image existed in digital form on Webbworld's servers, which made it available for decoding as an image file by the subscriber's browser software. The subscriber could view the images merely by visiting the Webbworld site. The evidence unequivocally shows that Webbworld electronically reproduced, distributed, and displayed PEI's protected images.

■ Webbworld's primary defense to the claim of copyright infringement is that, as a provider of access to Usenet images, it served as a mere conduit between its subscribers and adult-oriented newsgroups. *See Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F.Supp. 1361, 1372–73 (N.D.Cal.1995) ("*RTC*"). In *RTC*, the district court held that an Internet access provider and Internet bulletin board service operator were not directly liable for copyright infringement. *Id.* at 1366–72, 1381–82. The court reasoned, in part, that they were mere conduits for unaltered information, even though infringing files were temporarily stored on their com-

puters. *Id.* Here, Webbworld principals testified similarly that the infringing images would have existed on the Usenet whether or not Webbworld provided access to them or not. They argue that to hold them liable would be to hold the entire Internet liable for activities that cannot reasonably be monitored or deterred.

Webbworld's argument was rejected at summary judgment and is similarly unavailing after the additional evidence presented at trial. *See Webbworld*, 968 F.Supp. at 1177. Unlike the defendant service provider in *RTC*, Webbworld did not function as a mere provider of access. To visit the Netpics site, a subscriber first was required to gain access to the Internet itself by using an Internet service provider such as the defendant in *RTC*. Webbworld did not sell access; it sold adult images.

Also unlike the Defendant in *RTC*, Webbworld did not function as a passive conduit of unaltered information. Instead, Webbworld functioned primarily as a store, a commercial destination within the Internet. Just as a merchant might re-package and sell merchandise from a wholesaler, so did Webbworld re-package (by deleting text and creating thumbnails) and sell images it obtained from the various newsgroups. In contrast to the defendants in *RTC*, Webbworld took "affirmative steps to cause the copies to be made." *RTC*, 907 F.Supp. at 1381. Such steps included using the ScanNews software to troll the Usenet for Webbworld's product.

Webbworld contends that it had no control over the information its software retrieved from the Usenet and no control over the images posted therein. *See RTC*, 907 F.Supp. at 1372 (finding no liability because the defendant access provider "does not create or control the content of the information available to its subscribers"). On the contrary, Webbworld exercised total dominion over the content of its site and the product it offered its clientele. As a shop owner may choose from what sources he or she contracts to buy merchandise, so, too, did Webbworld have the ability to choose its newsgroup sources. Clearly, a newsgroup named, for example, "alt.sex.playboy" or "alt.mag.playboy" might instantly be perceived as proble-

matic from the standpoint of federal copyright law. Alternatively, Webbworld might simply have refrained from conducting business until it had developed software or a manual system of oversight to prevent, or at least to minimize the possibility of, copyright infringement. In any event, having developed and launched the ScanNews software for commercial use, Webbworld cannot now evade liability by claiming helplessness in the face of its "automatic" operation.

For those reasons, the Court rejects Webbworld's defenses and holds it directly liable for infringing PEI's twenty-nine copyright registrations at issue in trial of this case.

## IV. WILLFULNESS

■ PEI claims that Webbworld's infringement was willful. A defendant acts willfully if he knows his actions constitute an infringement; the actions need not have been malicious. *Broadcast Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 236 (5th Cir.1988). The practical significance of the issue of wilfulness is to increase the amount of statutory damages available to a plaintiff up to $100,-000 per infringement. 17 U.S.C. § 504(c)(2).

■ At trial, PEI offered evidence of certain images downloaded from the Webbworld site that infringed five of its copyright registrations. *See* Exhs. 5, 6. These images appeared on Netpics and were downloaded by PEI after Webbworld was on notice, by way of a temporary restraining order issued by this Court, that its site contained infringing material. Many of the images are instantly recognizable as belonging to PEI because of the trademark phrases or emblems printed on them. Furthermore, the images originated from a newsgroup called "alt.binaries.erotica.centerfolds." The title of that particular newsgroup, though not a PEI trademark, is sufficiently closely associated with PEI magazines to have put Webbworld on notice that the newsgroup potentially contained PEI images. Webbworld continued to carry that newsgroup until the business closed in February 1997.

Defendant Ives, president of Webbworld, testified at trial that anyone would have known that most of the images at issue belonged to PEI. Ives further testified that he knew that the "centerfolds" newsgroup contained infringing images and that he did not take any steps to prevent its use.

Defendants Ives and Ellis also testified, however, that the infringements were innocent. They maintained that identification and elimination of all PEI images was impossible and therefore that no infringement might be termed "willful."

The Court disagrees. Elimination by manual monitoring would have been difficult and expensive, but not impossible, particularly for images as obviously infringing as the ones at issue here. The evidence shows that Webbworld implemented substantial effort to combat the infringement. Notwithstanding its "compliance program," Webbworld chose to continue to copy from a newsgroup that essentially advertised by its "centerfolds" name that it carried PEI images. After it was on notice of infringement, Webbworld chose to stay in business without implementing a system that would reliably delete even such obvious transgressions. Such an action constitutes willful infringement. *See Broadcast Music, Inc.*, 855 F.2d at 236 (holding that a music vendor's choice to stay in business and thereby to continue to infringe copyrighted music was patently willful). For the five copyright registrations infringed by the many images Webbworld copied from the "centerfolds" newsgroup after the TRO was entered in this case, the Court makes a finding of willfulness.

## V. VICARIOUS INFRINGEMENT

■ PEI claims that each of the individual Defendants should be held vicariously liable for Webbworld's infringement. Participants in copyright infringement are jointly and severally liable as tortfeasors. *Swallow Turn v. Wilson*, 831 F.Supp. 575, 579 (E.D.Tex.1993). To show vicarious liability, a plaintiff must prove that a defendant (1) has a direct financial interest in the infringing activity, and (2) has the right and ability to supervise the activity which causes the infringement. *Id.* As with direct copyright infringement, intent or knowledge of the infringement is not an element of a claim for

vicarious liability. *Peer Int'l Corp. v. Luna Records, Inc.*, 887 F.Supp. 560, 565 (S.D.N.Y. 1995). "Innocence," therefore, is no defense. *Swallow Turn Music*, 831 F.Supp. at 578–79.

On summary judgment in this case, Judge Saffels held Defendants Ellis and Ives vicariously liable for the sixty-two direct infringements decided at that time. *See Webbworld*, 968 F.Supp. at 1177. Nothing in the evidence adduced at trial argues against holding these two similarly liable for the remaining infringements. Ellis testified that he had full control of the day-to-operations of the Netpics site throughout the relevant time period. Furthermore, he created and controlled operation of the ScanNews software that was the heart of the Webbworld enterprise, and he chose which newsgroups would serve as sources of material. In return, Ellis collected 50% of Webbworld's net profits. Ellis is vicariously liable for the infringements in this case.

Defendant Ives, until late January 1997, owned 100% of the outstanding Webbworld shares of stock and was Webbworld's president and director. He handled most of the legal and financial aspects of the business. Ives testified at trial that he had no involvement in the day-to-day operations of the business. He kept his full-time position with the United States Postal Service and devoted only about 20 hours per week to Webbworld. He viewed the Netpics site only a "couple of times" per week, typically when a change was made or a question raised. His testimony, corroborated by Defendant Gurkin, was that operational decisions were made only by consensus and that Ives did not—and did not believe he had the authority to—give orders to Ellis regarding operation of the business. Ives testified that he could "make suggestions" but could not control Ellis.

The reluctance of Ives to exercise his authority is not determinative of the issue. Courts that have examined the issue of vicarious liability have focused not on actual exercise of control but rather on the "right and ability" to exercise control. *E.g., Softel, Inc. v. Dragon Medical and Scientific Comms., Inc.*, 118 F.3d 955, 959 (2d Cir.1997) (defining vicarious liability as the "right and ability to supervise [that] coalesce[d] with an obvious and direct financial interest in the exploitation of copyrighted materials") (citations omitted); *Swallow Turn Music*, 831 F.Supp. at 578–79 (defining liability as the "right and ability" to exercise control) (and cases cited therein). In this case, Ives's ownership of 100% of the business and his position, therefore, as Ellis's employer, invested him with supervisory authority over all Webbworld operations, including the infringing activities. Even though he declined to exercise such authority, his right and ability to exercise it is sufficient for vicarious liability to attach.

It is undisputed that Ives received a significant and direct financial reward of 25% of Webbworld net profits for his efforts. Accordingly, Ives, along with Ellis, is vicariously liable for each of the remaining infringements at issue in this case.

The analysis with regard to Defendant Gurkin reaches a different result. Gurkin, who formerly worked for the United States Postal service and owned a security agency, contributed start-up capital to Webbworld. He derived significant financial benefit from the business in the form of 25% of the net income. With regard to establishing the requisite supervisory authority over the infringing activity, however, PEI has not met its burden as to Gurkin.

Gurkin worked as Webbworld's customer service representative, spending approximately 3–5 hours per day fielding and responding to subscribers' e-mail. Although the parties have stipulated that Gurkin, along with Ellis and Ives, "had the right, authority and ability to control the operations of the Netpics website," the Court finds that Gurkin did not have authority or supervision over the actual infringing activities. He was not a Webbworld shareholder until the very end of the company's existence. Gurkin testified that he had no access to the ScanNews software. Moreover, PEI did not connect him to any decision-making ability regarding which newsgroups the site used as sources of material. Accordingly, the Court finds that Gurkin should not be held vicariously liable for any of the infringements.

## VI. TRADEMARK INFRINGEMENT

■ PEI is the undisputed owner of valid federal trademark and service mark registrations, including PLAYBOY®, PLAYMATE®, the RABBIT HEAD DESIGN®, and PLAYBOY'S PLAYMATE REVIEW®.[1] In this case, PEI claims that Webbworld has infringed those trademarks. The Court disagrees.

■ Under section 1114(1) of Title 15, United States Code, any person who uses in commerce an imitation of a registered mark, without the registrant's consent and in a way that is likely to cause confusion, is liable for trademark infringement. Likelihood of confusion is, therefore, the touchstone of trademark infringement. *Soc. of Financial Examiners v. Nat'l Ass'n of Certified Fraud Examiners, Inc.,* 41 F.3d 223, 225 (5th Cir.), *cert. denied,* 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995).

■ In the Fifth Circuit, likelihood of confusion is determined by analysis of the following "seven digits":

(a) the type of trademark at issue (*i.e.,* the "strength" or distinctiveness of the mark);

(b) similarity of the trademark and the accused term or design;

(c) similarity of the products or services;

(d) identity of retail outlets and purchasers;

(e) identity of advertising media used;

(f) the defendant's intent; and

(g) actual confusion.

*Id.* at 228 n. 10.

A court must "evaluate the weight to be accorded the individual factors" and then make its ultimate decision thereon. *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1538 (11th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987). These "seven digits" are not elements of a plaintiff's cause of action, but instead comprise a nonexhaustive collection of considerations that may be relevant to the ultimate factual determination. *Conan Properties, Inc. v. Conans Pizza, Inc.,* 752 F.2d 145, 150 (5th Cir.1985). The absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of likelihood of confusion need not be supported by even a majority of the seven factors. *Id.* With these precepts in mind, the Court turns to an analysis of the evidence presented at trial of this case.

In the pre-trial order, the parties here have stipulated that the Playboy marks are "famous." Several courts, too, have recognized that PEI's marks are both strong and valuable. *E.g., Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc.,* 687 F.2d 563, 566 (2d Cir.1982); *Frena,* 839 F.Supp. at 1560–61. This Court agrees with the reasoning of the *Frena* court that the Playboy trademarks are distinctive and should be afforded a high degree of protection. *See id.* at 1559–60.

Nevertheless, the Court finds no significant likelihood of confusion to be present in this case. PEI presents no evidence of actual confusion by Webbworld subscribers or others. *See Moore Business Forms, Inc. v. Ryu,* 960 F.2d 486, 491 (5th Cir.1992) ("Evidence of actual confusion is often the best evidence of likelihood of confusion."); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir.) (holding that actual confusion, though not required, is the best evidence supporting trademark infringement), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *see also World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir.1971). More significantly, the Court finds that any confusion would be unreasonable here. The number of images found at any one time on the Netpics site was between 50,000 and 80,000. Defendant Ives testified credibly that images infringing PEI copyrights comprised less than 1% of that total number. Of the infringed copyrighted images introduced as evidence at trial, the percentage bearing a PEI trade-

---

1. At issue are Registration Numbers 643,926 (trademark RABBIT HEAD DESIGN for monthly magazines); 1,971,523 (service mark RABBIT HEAD DESIGN for on-line magazines in the entertainment field); 600,018 (trademark PLAY-BOY for monthly magazines); 1,691,469 (trademark PLAYBOY'S PLAYMATE REVIEW for magazines); 1,733,661 (service mark PLAYBOY'S for entertainment services); and 721,987 (trademark PLAYMATE for calendars).

mark or service mark is even smaller.[2] Accordingly, the effect of PEI's marks on the overall tenor of the Webbworld site is, in the Court's view, *de minimis*.

Ironically, PEI established at trial that its "purchasers" are not the same as Webbworld's. PEI witness Gene Snyder testified he found primarily hard-core pornography on Webbworld's site. Robert Perkins, executive vice-president of PEI in charge of marketing, testified at trial that the vast majority of PEI customers are decidedly not consumers of pornography. Accordingly, the fourth digit weighs against confusion.

Finally, the Court agrees that the Webbworld home page is unequivocal in its purpose and affiliation, or lack thereof:

### "Cyberporn on the Internet!?"

It's really out there, **hundreds of Mega-Bytes** of uncensorable new pictures from around the world every day! It's buried in so-called USENET news "articles." But it's very **time consuming** and requires lots of **technical knowledge** to find, download, decode, and view pictures from USENET news articles ... **Now you don't have to put up with it anymore.** Netpics has done all of the work for you; we've found the newsgroups, we comb them for pictures, and we present them to you right here, on the Web (or *via FTP* ). All you have to do is sit back and click!

Exh. 7 (boldface and emphasis in original). The origin of Webbworld is clear; its lack of sponsorship by PEI is equally apparent. The weight of the credible evidence shows that Defendant's intent was neither to infringe PEI's trademarks nor to generate confusion. The presence of PEI's marks was, moreover, incidental and even irrelevant to the product that Webbworld offered and its subscribers bought. *Cf. Universal Money Centers, Inc. v. American Tel. & Tel. Co.*, 22 F.3d 1527, 1533–34 (10th Cir.1994) (affirming the trial court's finding of no likelihood of confusion where evidence of actual confusion was *de minimis* and where presence of alleg-

edly infringing trademark was irrelevant to consumers).

It is true that some of the other "seven digits" are present here. Both PEI and Webbworld are in the business of entertainment publishing, and both publish and advertise on the World Wide Web. The marks found on Netpics are identical to PEI's. *See Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980) (observing that the greater the similarity between marks, the greater the likelihood of confusion). On the other hand, Webbworld neither had nor used marks of its own to generate confusion. The Netpics marks are not confusingly identical imitations of PEI's marks; they *are* PEI's marks placed by PEI on its subsequently infringed photographic images. In that event, and in the presence of the other factors discussed above, the facts of this case weigh heavily against likelihood of confusion.

In a similar Internet case involving PEI's trademarks, a Florida district court found trademark infringement to exist. *See Frena*, 839 F.Supp. at 1560–61. In *Frena* the defendant was an Internet Bulletin Board Service operator that distributed unauthorized copies of PEI copyrighted photographs. *Id.* at 1554. After finding copyright infringement, the court also found infringement of the same trademarks at issue in this case. *Id.* at 1560–61. In the *Frena* case, the trademarks PLAYBOY® and PLAYMATE® were used to designate files containing the infringing photographs. *Id.* at 1559. Furthermore, PEI's text was often removed from the photographs and replaced with the defendant's name and telephone number. *Id.* The *Frena* court found that the defendant thus falsely suggested an affiliation with PEI. *Id.* at 1561.

Such is not the case here. Although Webbworld used the corresponding newsgroup name to identify the source of its files, the evidence shows that in only a very few of the 170–180 Usenet sources was a PEI trademark involved. Although other filenames may have referred to PEI publications, *e.g.*, "covers" or "centerfolds," the registered

---

**2.** The number of images submitted at summary judgment bearing PEI trademarks or service marks is higher than those in evidence at trial.

Still, the overall effect in light of the huge number of images on the Netpics site is insignificant.

marks are not present. Here, unlike in *Frena*, there is no evidence that Defendants intended to usurp PEI's goodwill. *See id.* at 1561. PEI presented no evidence that Webbworld attempted to generate confusion by superimposing its own name on the PEI images, as did the *Frena* defendant. *See id.* at 1559. Furthermore, as explained previously, the evidence does not support any suggestion of affiliation or sponsorship of the site by PEI. *Cf. id.* at 1561 ("It is well established that 'falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source of sponsorship constitutes infringement.'") (quoting *Burger King v. Mason,* 710 F.2d 1480, 1492 (11th Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984)). Accordingly, the Court holds that on the issue of trademark infringement, *Frena* is distinguishable from the facts and circumstances of this case.

PEI has not proved by a preponderance of the evidence that Webbworld infringed its trademarks phrases and image. Because there is no direct trademark infringement, PEI's claim of vicarious infringement by the individual Defendants fails as well.

## VII. UNFAIR COMPETITION

### A. *Lanham Act*

■ PEI brings a claim for "unfair competition" under Section 43(a) of the Lanham Act. *See* 15 U.S.C. § 1125(a).[3] As with trademark infringement, "likelihood of confusion" is the key test for determining whether such a false designation has occurred. *Louisiana World Exposition, Inc. v. Logue,* 746 F.2d 1033, 1039 (5th Cir.1984). The same "seven digit" test is determinative. *See id.* For the same reasons as in the preceding section, the court holds that PEI has not proved by a preponderance of the evidence that Defendants should be held liable for unfair competition under the Lanham Act.

### B. *Texas Common Law*

■ PEI brings a similar claim for unfair competition under Texas common law. Unfair competition relates to "causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 14 (5th Cir.1974). Under Texas law, unfair competition involves the question "whether the defendant is passing off his goods or services as those of the plaintiff by virtue of a substantial similarity between the two, leading to confusion on the part of potential customers." *Volkswagenwerk Aktiengesellschaft v. Rickard,* 492 F.2d 474, 478 (5th Cir.1974). The plaintiff need not prove the defendant intended to deceive customers or that customers were in fact deceived. *Line Enterprises, Inc. v. Hooks & Matteson,* 659 S.W.2d 113, 117 (Tex.Ct.App.1983). Instead, it is sufficient to show that deception will naturally and probably result from the operation or that the public is likely to be deceived or confused. *Id.*

■ Under the same evidence discussed above, PEI has not shown unfair competition under Texas law. Neither the testimony nor the exhibits indicate that PEI sponsored, endorsed, or approved the images available on the website. *See Jud Plumbing Shop on Wheels v. Jud Plumbing & Heating, Inc.,* 695 S.W.2d 75, 80–81 (Tex.Ct.App.1985). Nor does any evidence suggest that the Defendants were trying to "pass off" their site or product as belonging to PEI. Defendants are not liable under this formulation of common-law unfair competition.

---

**3.** 15 U.S.C. § 1125(a) provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Unfair competition under Texas law also includes misappropriation of a business opportunity. *United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 218 (Tex.App.—Waco 1993, writ denied). The elements of that cause of action are (1) the creation of plaintiff's product through extensive time, labor, skill, and money; (2) the defendant's use of that product in competition with the plaintiff thereby gaining a special advantage in that competition because defendant is burdened with little or none of the expense incurred by the plaintiff; and (3) commercial damage to the plaintiff. *Id.* at 218.

In this case, the evidence tends to establish the first element of PEI's claim. With regard to the second element, however, the Court is not persuaded by the evidence at trial that Webbworld obtained any "special advantage" over PEI in business competition.

On the third element, PEI's claim fails conclusively. The testimony of Robert Perkins, PEI's executive vice-president for marketing, is that PEI did not see any drop in sales during the time period in which Webbworld operated. No evidence of relative stock price was offered. No probative evidence of diminution of value of PEI's copyrights was introduced. In short, the Court finds no evidence of actual "commercial damage" to PEI resulting from Webbworld's activities.

For those reasons, PEI has not met its burden to prove a state-law claim for unfair competition.

## VIII. DILUTION

Under section 1125(c) of Title 15, United States Code, PEI brings a separate cause of action for "dilution" of its trademarks.[4] The owner of a famous mark may obtain relief under an anti-dilution statute if there is a likelihood of dilution due to (1) "blurring," a diminution in the uniqueness and individuality of the mark; or (2) "tarnishment," an injury resulting from another's use of the mark in a manner that tarnishes or appropriates the goodwill and reputation associated with the plaintiffs mark. *See Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1072 (5th Cir.) (discussing the Texas statute), *cert. denied,* — U.S. —, 118 S.Ct. 299, 139 L.Ed.2d 231 (1997); *see also The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 965–966 (2d Cir.1996); *Intermatic, Inc. v. Toeppen*, 947 F.Supp. 1227, 40 U.S.P.Q.2d 1412 (N.D.Ill. 1996).

In this case, no probative evidence was presented at trial on the issue of "blurring." Instead, the evidence goes primarily to "tarnishment." PEI employee Gene Snyder testified that PEI images appeared on Netpics in close proximity to what he regards to be hardcore pornography—images with "explicit sexual content."[5] Perkins testified that display of PEI images in such an environment serves to diminish the prestige of the marks. PEI's brand image is one of romance and *joie de vivre*, he testified; PEI's "core promise" to its consumers is that PEI images represent "tasteful nudity" in photography of the highest quality. Perkins opined that if the public were to perceive that PEI had gone into the pornography business, the effect on sales would be disastrous.

On cross-examination, however, Perkins admitted that PEI has a wide channel of

---

4. Section 1125c of Title 15, United States Code, provides: "The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection."

5. PEI also contends that its images were displayed in close proximity to child pornography, for which the individual Defendants were allegedly arrested in February 1997. PEI presents no evidence, however, of child pornography appearing on the Netpics site, which is the sole alleged source of infringement in this case. Webbworld computers were used for other pursuits associated with adult images that were not affiliated with the Netpics site. *See* Ellis Depo. Because the child pornography charges might just as easily have stemmed from one of the other pursuits, PEI has not proved that any child pornography appeared on the Netpics site in conjunction with PEI images.

distribution that includes adult bookstores. Perkins also admitted that PEI cannot control where and how its publications or centerfolds are displayed by merchants and the public. Furthermore, as the Court has already found, the PEI marks and images had only a *de minimis* presence on the Netpics site. For these reasons and others previously stated, the Court finds no dilution to have occurred here.

## IX. CONTEMPT

■ Finally, PEI moves for contempt of court against Defendant Ellis for alleged violation of the preliminary injunction in effect in this case. A party commits contempt when he violates a definite and specific order of the court requiring him to perform or to refrain from particular conduct and when he acts with knowledge of the court's order. *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir.1995); *Securities and Exchange Comm'n v. First Financial Group of Texas, Inc.*, 659 F.2d 660, 669 (5th Cir.1981).

■ In a civil contempt proceeding, the movant bears the burden of establishing the elements of contempt by clear and convincing evidence. *Petroleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d 392, 401 (5th Cir.1987). The "clear and convincing evidence" standard is higher than the "preponderance of the evidence" standard, common in civil cases, but not as high as "beyond a reasonable doubt." *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir.1976). In the context of a civil contempt proceeding, clear and convincing evidence is defined as the weight of proof that "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts." *Travelhost*, 68 F.3d at 961 (citations omitted).

■ In this case, Defendant Ellis was restrained by order of January 6, 1997, from "directly or indirectly reproducing, distributing or displaying any computer file or image that is substantially similar to any copyrighted PEI image or photograph." PEI claims that Ellis has violated that proscription by

his business relationship with a California company named Yehudi International Network Group, Inc. ("Yehudi").

It is undisputed that in about April 1997, three months after the preliminary injunction was entered, Ellis agreed to sell the Scan News software to Yehudi for $15,000. Before that, a licensing agreement was contemplated between Ellis and Yehudi, pursuant to which Ellis would receive 50% of Yehudi's profits. Furthermore, Ellis received some $20,000 for "consulting services" he performed for Yehudi during that time. Since then, PEI has filed an infringement lawsuit against Yehudi along lines similar to this one. In the California lawsuit, PEI claims that Yehudi began operating the Netpics site after Webbworld's demise—under the same name, with the same ScanNews software, and on the same infringing basis. On September 10, 1997, PEI obtained a preliminary injunction against Yehudi based on the alleged Netpics infringements. PEI now claims that Ellis assisted Yehudi in its operations and is thus in violation of the preliminary injunction entered in this case.

At trial, Ellis testified that he did not assist Yehudi in any infringing activities. According to Ellis, his consulting work entailed loading the software, making sure the servers and e-mail were operating correctly, and setting up and backing up the system. He testified that the ScanNews software need not be used to access and copy images from adult newsgroups; rather, the subject matter might be anything from flowers to sound or video clips, depending on how the software is used. Ives indirectly confirmed the possibility of Ellis's innocent participation in that regard by referring to ScanNews as "percussive" software that would require a certain amount of consulting for proper operation regardless how it was used. *See* Ives Depo.

In his trial testimony, Ellis denied knowledge of Yehudi's activities and denied consulting with a view to reviving the "Netpics" site. Furthermore, he denied involvement with Yehudi's choice of newsgroups. Ellis disavowed any knowledge of the preliminary injunction in place in the California lawsuit.

He testified that he ceased consulting for Yehudi and sold them the software outright because Yehudi was not paying him 50% of its net profits as it had agreed to do in return for the ScanNews license. Although Ellis testified that he agreed to license the software to Yehudi under the terms above, the written agreement PEI admitted into evidence was unexecuted. Ellis testified that no signed agreement exists. Ellis Depo.

Based on this evidence, the Court believes it is more likely than not that Ellis violated the preliminary injunction in effect in this case. The standard for contempt, however, is more stringent. *See Travelhost,* 68 F.3d at 961. Although a preliminary injunction is in effect in the California case, and therefore a finding of PEI's substantial likelihood of success on the merits has been made, no final ruling of infringement has been adjudicated. PEI offers this Court no evidence from which to determine infringement independently. The Court declines to construe Ellis's knowledge and involvement by means of the terms of an unexecuted licensing contract that may or may not reflect Ellis and Yehudi's final agreement. Moreover, PEI offers no fact from which the Court can infer with "clear conviction, without hesitancy" that Ellis's involvement would of necessity have required him to have knowledge of any infringing content of Yehudi's site. Even if the Court could so infer, there is no clear and convincing evidence that Ellis had the requisite right and ability to supervise such infringing activity. Accordingly, PEI has not met its burden of establishing by clear and convincing evidence that Ellis directly or indirectly infringed PEI's images in violation of this Court's preliminary injunction.

## X. RELIEF GRANTED

Pursuant to the claims on which PEI has prevailed, PEI asks for relief of statutory damages, a permanent injunction, and attorney's fees. For the reasons that follow, each request is granted.

### A. *Statutory Damages for Copyright Infringement*

PEI has elected to pursue statutory damages for its established claim of copyright infringement. A copyright owner whose copyright has been infringed may, at any time before judgment, elect to recover either actual damages or statutory damages. 17 U.S.C. § 504; *see Central Point Software,* 903 F.Supp. at 1060–61. If statutory damages are elected, the Court may award any just remedy in an amount ranging from not less than $500 to not more than $20,000 for each copyrighted work found to be infringed. 17 U.S.C. § 504(c); *see Central Point Software,* 903 F.Supp. at 1061. For the violations the Court has found to be willful, the maximum statutory award is raised to $100,000 per infringement. *See id.*

■■■ Within the range defined by the statutory maximum and minimum, the court has virtually unfettered discretion in setting the damage award. *F.W. Woolworth Co. v. Contemporary Arts,* 344 U.S. 228, 231, 73 S.Ct. 222, 97 L.Ed. 276 (1952); *see Broadcast Music, Inc. v. Star Amusements, Inc.,* 44 F.3d 485, 487–89 (7th Cir.1995) (holding that the standard of review for an award of statutory damages is even more deferential than an abuse of discretion standard) (citing *Douglas v. Cunningham,* 294 U.S. 207, 210, 55 S.Ct. 365, 79 L.Ed. 862 (1935)). Among the numerous factors considered by the courts in setting statutory damage amounts are the expenses saved and profits reaped by the infringer; the deterrent effect of the award on a defendant and on third parties; and the infringer's state of mind in committing the infringement. *See, e.g., Nintendo of America, Inc. v. Dragon Pacific Intern.,* 40 F.3d 1007, 1011 (9th Cir.1994), *cert. denied,* 515 U.S. 1107, 115 S.Ct. 2256, 132 L.Ed.2d 263 (1995); *Fitzgerald Pub. Co. v. Baylor Pub. Co.,* 807 F.2d 1110, 1117 (2nd Cir.1986).

■■■ In this case, the evidence shows that in its 9–month existence, Webbworld generated approximately $670,000 after some but not all expenses, and before taxes. According to further testimony from Defendant Ives, Webbworld's net income was between $400,000 and $450,000 for the relevant period. The testimony is not clear to what extent, if at all, appropriating PEI images rather than generating original images served to decrease Webbworld's operating expenses.

The weight of the evidence establishes that even after becoming aware of obvious infringements, Webbworld continued to operate overall at approximately the same pace, and with an increasing clientele, while declining to develop software or an effective manual monitoring plan to eliminate copying of PEI images. A simple reduction in the number of newsgroups covered would have facilitated lawful operation. Under those circumstances, continuing to operate virtually unrestrained showed, at best, reckless disregard of PEI's legal rights.

As a somewhat mitigating factor, the Court finds that Webbworld and its principals attempted to put a "compliance plan" in place after entry of the TRO to reduce the risk of infringement. Some steps were taken to accomplish that goal. Furthermore, the Court finds that the twenty-nine infringements at issue at trial are substantially less identifiable as PEI images than the ones submitted at summary judgment. Specifically, the images do not appear for the most part in proximity to a title, phrase or emblem connecting them to PEI. Accordingly, the Court regards these infringements as more difficult to detect and therefore as somewhat more likely to be "innocent" than the ones at issue in summary judgment.

PEI appears to find great negative significance in that Defendants made a relatively large amount of money for a relatively small investment of capital and time. On the contrary, the Court finds no reason to deter capitalism in the technological or any other arena.

Copyright infringement, however, must not be allowed to serve as the cornerstone of a profitable business. Under all of the circumstances of this case, the Court awards to PEI $1,000 for each of the 29 copyrights at issue at trial. For the 5 infringements found to be willful, the Court awards an additional $20,000 per infringement. Along with the $310,000 awarded at summary judgment, the total amount of statutory damages awarded in this case is $439,000.

## B. *Permanent Injunction*

■ In addition to damages, PEI asks the Court to enter a permanent injunction.

Under the Copyright Act, a court may grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright. 17 U.S.C. § 502(a). Permanent injunctive relief is "never lightly given." *Posada v. Lamb County, Tex.*, 716 F.2d 1066, 1070 (5th Cir. 1983). To establish entitlement to permanent injunctive relief, a party must demonstrate the following: (1) actual success on the merits; (2) no adequate remedy at law; (3) that the threatened injury outweighs any damage to the defendant; and (4) that the injunction will not disserve the public interest. *Caroline T. v. Hudson School Dist.*, 915 F.2d 752, 755 (1st Cir.1990); *Picker Int'l v. Blanton*, 756 F.Supp. 971, 978 (N.D.Tex. 1990); *see also DSC Comms. Corp. v. DGI Tech., Inc.*, 81 F.3d 597, 600 (5th Cir.1996) (applying the traditional factors to a preliminary injunction application for copyright infringement).

■ In this case, PEI has prevailed in its case for copyright infringement. The burden that would be imposed on Defendants—merely to refrain from further infringement—is light in comparison to the threatened injury to PEI should such infringement occur. Furthermore, the Court finds that the public interest, to the extent it is involved at all in this private business matter, is affirmatively served by requiring continuing, strict adherence to intellectual property law in the relatively uncharted arena of Internet commerce.

It remains to be decided only whether PEI has an adequate remedy at law in this case. To prevail on this issue, PEI must show a significant threat of cognizable injury and that money damages would not fully repair the threatened harm. *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir.1986); *see Danden Petroleum, Inc. v. Northern Natural Gas Co.*, 615 F.Supp. 1093, 1099 (N.D.Tex.1985) ("Injuries which can be compensated by money damages at a later time are not irreparable and do not warrant the extraordinary remedy of an injunction.").

In analyzing the evidence in this case, the Court revisits Robert Perkins's testimony

that PEI's reputation would be damaged by continued display of PEI images in close conjunction with "hard-core pornography." Although the Court did not find the past harm to have risen to the level of tarnishment required for dilution of trademark under all the circumstances, the evidence is at least probative on the issue of potential harm for which legal remedy is inadequate. *See Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1053–56 (5th Cir.1997) (holding potential damage to reputation to constitute irreparable harm). Additionally, the Court finds a strong suggestion that Defendants Webbworld, Ives, and Ellis may not be in a position to provide future monetary relief if required. The assets of Webbworld, its computers and files, have been seized; and the ScanNews software, the heart of Webbworld's business, has been sold to the Yehudi company in California. Of course, these facts may argue equally that no serious danger of recurrent violation exists. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (requiring for permanent injunction that there be "something more than the mere possibility which serves to keep the case alive").

On the other hand, a finding of willful infringement has been made in this case. Defendants have not shrunk from continuing their activities even when put on notice of infringement. *See Dream Dealers Music v. Parker*, 924 F.Supp. 1146, 1152 (S.D.Ala. 1996) (awarding a permanent injunction against the owner of a broadcast station who "willfully and flagrantly" persisted in infringing conduct). Moreover, Defendant Ellis, who wrote the ScanNews software, is capable of and amenable to re-creating it for the same purpose. *See* Ives Depo. (noting that Ellis continued to look for a way to profit from the ScanNews software before the sale to Yehudi); Ellis Depo II, at 41 (indicating that as of August 11, 1997, Ellis continues to write Internet-related software).

Under all of these circumstances, PEI has made a sufficient showing of the potential for irreparable harm and the substantial likelihood of further infringement. *See Marvin Music Co. v. BHC Ltd. Partnership*, 830 F.Supp. 651, 655 (D.Mass.1993) (noting that once liability for copyright infringement has been established, courts generally grant a permanent injunction if there is a substantial likelihood of continuing infringement). By separate order, Defendants Webbworld, Ellis and Ives will be permanently enjoined from infringing PEI's copyrighted images.

### C. *Attorney's Fees*

■ PEI asks the Court to award its reasonable attorney's fees. Under the Copyright Act, a court may in its discretion award attorney's fees to the prevailing party in a suit for copyright infringement, 17 U.S.C. § 505; *see Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 522, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). In this Circuit, attorney's fees "should be awarded routinely" to a party prevailing in a claim for copyright infringement. *Micromanipulator Co. v. Bough*, 779 F.2d 255, 259 (5th Cir.1985); *see Meadowgreen Music Co.*, 789 F.Supp. at 828.

■ PEI has prevailed on its causes of action for copyright infringement against Webbworld and for vicarious copyright infringement against Defendants Ellis and Ives. Under the circumstances of this case, an award of reasonable and necessary attorney's fees is appropriate.

## XI. CONCLUSION

For the reasons set out above, the Court rules as follows. Plaintiff has proved its claim for infringement of twenty-nine copyrights in addition to the sixty-two infringements found on summary judgment. Of those infringements, five were willful. The Court awards statutory damages of $129,000, in addition to the $310,000 awarded at summary judgment. Individual Defendants Ellis and Ives are vicariously liable for all infringements and are therefore jointly and severally liable for the damages awarded.

PEI did not meet its burden of proof at trial for the following claims against Defendants: trademark infringement, indirect trademark infringement, unfair competition, and dilution. PEI did not prove by a preponderance of the evidence that Defendant Gurkin should be held liable for vicarious copyright infringement. On the issue of con-

tempt against Defendant Ellis, PEI similarly did not meet its burden of proof.

PEI's request for a permanent injunction prohibiting future copyright infringement is **GRANTED.**

PEI's request for reasonable attorney's fees is **GRANTED.** Counsel for the parties are **DIRECTED** to confer in an attempt to reach agreement on the amount of such fees. Should agreement be reached, counsel are directed to file the appropriate papers with the Court on or before *noon, December 22, 1997.* If agreement cannot be reached, PEI is **DIRECTED** to file its attorney's fees affidavit and brief, applying the factors approved by this Circuit, by the same date. Defendants may file written opposition, if any, on or before *noon, December 29, 1997.*

PEI is **DIRECTED** to prepare a Final Judgment, which shall include a permanent injunction, consistent with this Memorandum Opinion and Order. PEI is further **DIRECTED** to confer with Defendants as to form of the proposed judgment and to file it with the Court on or before *noon, December 22, 1997.*

SO ORDERED.